Argued May 3; affirmed May 17, 1949

# SABIN *v.* TERRALL
206 P. 2d 100

*E. M. Sabin,* of Union, argued the cause for appellant. With him on the brief were Helm & Helm, of La Grande.

*S. H. Burleigh,* of La Grande, argued the cause for respondent. On the brief were Dixon & Burleigh, of La Grande.

Before LUSK, Chief Justice, and BRAND, ROSSMAN and BAILEY, Justices.

BRAND, J.

Notice of appeal was served on 30 September 1948. Viola Parker to whom we shall refer as the plaintiff died on 28 February 1949 and Edward M. Sabin as executor of her will has been substituted in this court as plaintiff. We will first set forth facts appearing in the pleadings and evidence which are undisputed.

■ Esther E. Pursel died in the year 1929 leaving to the plaintiff certain specific legacies and leaving the residuum after the payment of claims and expenses, one-half to the plaintiff and one-half to Jeannette Moran. The defendant Terrall, an attorney at law, and Wilbur B. Davis were appointed and qualified as executors under the Pursel will. The responsibility for the administration was largely that of the defend-

ant. The estate was of substantial size, consisting of real estate, notes and rentals of a probable value of $71,000. Among the assets of the Pursel estate was a block of stock in a corporation which owned and operated a hotel in the city of Union. The hotel company was in financial difficulties, if not absolutely insolvent. The country was in the depths of a depression, of which the court takes judicial notice. The executors of the estate, in cooperation with other persons interested in the hotel, expanded large sums of money in an attempt to restore it to the condition of a going concern. The attempt failed and considerable amounts of money of the estate were lost in that venture. In April, 1935, the executors filed their final account and on 16 December 1935 an order was made by the court allowing said final account, discharging the executors from the trust and exonerating their bondsmen. The estate was closed under conditions of extreme irregularity, due in part at least, to pressure brought by the company which had executed the executors' bond. The work of administration had not been completed at the time the estate was closed, but at that time an arrangement was made whereby the property was distributed to the residuary beneficiaries who assumed and agreed to pay the outstanding obligations. An agreement signed by the plaintiff and Jeannette Moran in May 1936 recites that the estate was closed leaving unpaid about $5,000 of the specific legacy to the plaintiff and also leaving unpaid two notes against the state in the principal sum of $9,000 "which said notes were assumed by said residuary legatees; as well as settlement with the executors of said estate;" The instrument then recites that the parties thereto were desirous of making a settlement between themselves and dividing

the residue. It provides for the division of the property and as a part of the agreement it is provided:

"The said Viola Parker shall assume and pay the promissory note, now held by Sarah K. Caspar in the principal amount of $4,000; also the promissory note now held by the First National Bank of Portland, Union Branch, in the principal sum of Five Thousand dollars; settle the claim of the executors against said estate; and also all other claims against said estate."

The defendant acted as attorney for both legatees from the time when the property was turned over to them until May 1936 when the settlement agreement was made between the plaintiff and Jeannette Moran. From May, 1936, and until November, 1942, the defendant Terrall served as attorney for the plaintiff. Late in 1942 the defendant turned over to the plaintiff certain assets belonging to her which were in his possession and he was discharged as attorney.

This is the third time that litigation growing out of the Pursel estate has been before this court. *New Amsterdam Casualty Company v. Terrall et al.,* 165 Or. 390, 107 P. (2d) 843, decided by this court in favor of the defendant. *Caspar v. Parker,* 175 Or. 555, 154 P. (2d) 554 which was an action on a note signed by Mrs. Parker pursuant to the terms of the agreement between Mrs. Parker and Jeannette Moran quoted supra. In the latter case this court discussed the disastrous situation arising out of the hotel transaction and rendered judgment in favor of Mrs. Caspar against the defendant Viola Parker, plaintiff here. With this background we turn to the allegations of the pleadings, without, however, repeating the matters of fact already set forth. The plaintiff apparently seeks an accounting of all transactions handled by the defendant Terrall

from the time of his original appointment as executor in 1929 down to the date of the suit. The complaint alleges that the defendant had control of the assets of the estate; that the plaintiff had never had any business experience; was aged and infirm; and, "nor did she have exact knowledge of the nature or assets of said estate until the latter part of 1942 when certain securities belonging to her, as beneficiary under said will were turned over to her by said defendant." Plaintiff alleges that other sums in amount unknown were received by the defendant and not accounted for. She alleges that the defendant was her personal attorney from 1930 until 1944 and that defendant agreed to collect moneys due her and pay the same over to her or dispose of the same according to her specific directions. She alleges further that the defendant has received over $7,000 for plaintiff's benefit and has paid to plaintiff not more than $1,500 therefrom. She alleges that she has demanded an accounting which has been refused her. The defendant filed a general denial except as specially admitted, and alleged as his separate answer that the property of the state could not be liquidated in the early thirties by reason of the depression; that in April 1935 all of the special bequests, with the exception of the one to the plaintiff, had been fully paid and he alleges the closing of the estate; the assumption of the indebtedness by the legatees, including $2,000 as executors' and attorney's fees. He then alleges the settlement between the plaintiff and Jeannette Moran and his service as attorney for the plaintiff from May, 1936 to November, 1942. He alleges that he kept the plaintiff fully informed concerning the business transacted and furnished her a statement of all receipts and disbursements and a full accounting. He attaches to his answer as Exhibit "A"

a statement of all moneys belonging to the plaintiff that came into the hands of the defendant during the time he was acting as attorney. Plaintiff filed a long and repetitious reply which we will attempt to summarize. She alleges that the reason the estate was not settled was that the executors unlawfully appropriated to their own use $10,000 of estate funds. She denies that she was kept advised concerning estate matters. She alleges that the final account of the executors was false in many particulars, without specifying them, and "specifically denies that she 'assumed all of the unpaid indebtedness remaining from said estate' or any part thereof." She alleges that she was never informed that there was any unpaid indebtedness of the Pursel estate. She alleges that she never had, but was entitled to have, independent advice in matters pertaining to the business intrusted to the defendant. She then makes specific admissions and denials concerning the items contained in the account, Exhibit "A", attached to the answer. She alleges that the defendant was never authorized to pay out any sums of money upon any indebtedness of the plaintiff to others.

The first and a serious difficulty with the appeal of this plaintiff is found in the fact that only four exhibits have been brought to this court although fifty-seven exhibits were introduced, all but one of them by defendant. In addition to the four exhibits attached to the transcript, we have the benefit of the statement by plaintiff's counsel wherein he quotes portions of the written and signed agreement between the plaintiff and Jeannette Moran, to which we have previously referred. The situation concerning the exhibits is utterly confusing. The official court reporter certifies

that "the foregoing pages * * * constitute a true and correct transcription * * * and entire testimony * * * including exhibits offered * * * ". The certificate of the trial judge purports to certify that the transcript of the evidence and exhibits which he designates as a "Bill of Exceptions" constitutes an accurate record of all exhibits offered. A further certificate of the county clerk is to the effect:

> " * * * that the foregoing Transcript of Testimony and Exhibits (Plaintiff's Exhibit A, Defendant's Exhibits 11, 12, 13, only) are the original Transcript of Testimony and such exhibits, hereinabove enumerated, as have been, and are now in my possession, * * * "

■■ The opinion of the trial judge which was improperly included in the Abstract of Record states that the court has been unable to secure the exhibits and "has no knowledge of what has happened to such exhibits." We would be justified in affirming the decree of the lower court upon the sole ground that the appellant has not brought up the exhibits.

■ The case at bar was not tried upon the broad issues presented by the complaint nor can we consider them here. At the commencement of the trial the following colloquy occurred between the court and counsel for the plaintiff:

> "Now I would like to say to the attorneys, before we start in,—I am not familiar with all of these accounts, of course, and I haven't gone through this proceedings, as you attorneys have, but it was the ruling of the Court, and it is the expectation of the Court at this time, not to go back and open up any final accounting that was filed in the Probate Court.
>
> "Now there is an allegation in your Reply that the account was false and fraudulent; it was known to the defendant at that time, but not to the plain-

tiff, but the Court is still going to be bound by that report, and, I don't believe, in a collateral proceeding, would have any power or authority—

"MR. SABIN: (Interrupting) If Your Honor please, we don't ask—to that report—an accounting on that, except insofar as it is involved in this way: He alleges a claim for $2,000.00, Executor's fees in that estate. We have a right to show he had been paid his Executor's fees, and the burden is upon him to show—

"THE COURT: I will permit the testimony to go in as to those, used as an offset in this accounting; but I don't want to go in and open up—

"MR. SABIN: (Interrupting) We don't ask you to. We take the position they are alleging these attorney's fees, or Executor's fees, were due. We have a right to find out how much they received as Executor's fees; and as attorney's fees they can't recover anything anyway, because the executor can not recover attorney's fees where he is attorney, under the statute. He can't recover both. If he claims here, this is for executor's fees, we have got a right to find out what he received."

At a later point in the trial the court said:

"THE COURT: Mr. Helm, I am not going to open this matter up and go back and try the whole operation of this estate, and in this accounting I am not going to permit a wrongful expenditure of money during the time of the estate, and try that case out, in which that matter has been settled. If you want to limit this just to the purpose of showing that there was money at that time, then to rebutt the testimony that has been given, I will permit that, but don't go too far into detail, because I don't want to try the other case."

To which counsel for the plaintiff replied: "I agree with Your Honor."

Near the close of the trial and without objection from the plaintiff the court again stated its position and announced that the accounting would go back only to 1935, the date of the closing of the estate. That most of the evidence received related to the period prior to the closing of the estate, and the reason therefor, is shown in the following statement quoted from the opinion of the trial court. Referring to the controversy concerning the operation of the hotel property by the executors, the court said:

"The testimony regarding that matter was allowed in the first instance for the purpose of establishing what a reasonable attorney fee would be in the handling of said estate. If the attorney fee had been fixed in dollars and cents in the meetings between the executors and the two residuary legatees, when the property was distributed there would have been little controversy to have been decided in this case; but after testimony regarding the administration was once opened up, there seemed to be no line to be drawn in limiting the testimony introduced."

■ As we have indicated, the defendant contends that in 1935, immediately prior to the closing of the estate, there were debts of the estate remaining unpaid and that in order that the estate might be closed the residuary beneficiaries agreed to assume those debts, including the expenses of the administration. The defendant's position is supported by the weight of the evidence. Speaking of a conference between the two executors, Mrs. Moran and the plaintiff, defendant Terrall testified:

"Q Now at the time of the filing of that final account what, if any, agreement did you have with the plaintiff here, and Jeannette Moran, who are

admitted in the pleadings to be the residuary legatees of the estate?

"A Well, at that time the bonding company wanted the estate closed, and Mr. Davis, Mrs. Parker and myself went over to Mrs. Moran's home at Elgin, and I explained the situation to them, and told them that the estate was not in a position to be closed, on account of the fact that there was indebtedness owing by the estate. They agreed that they would substitute themselves—

"Q Was there sufficient money in the estate to pay this indebtedness?

"A No, not in cash.

"Q There were notes and real estate?

"A There were notes and real estate, but not sufficient cash.

"Q They agreed they would substitute themselves?

"A We served a citation on the other legatees, who had been paid off. I went back again to Mrs. Moran's home, with Mr. Davis and Mrs. Parker, and they agreed that they could settle it themselves.

"  *    *    *

"A They said they, being the only ones interested in that estate, could settle it themselves without a court, and would assume the indebtedness, take over the receipts, and settle the estate with the court.

"Q And following that was that done?

"A It was done.

"Q The final account was approved, and you were discharged?

"A We were.

"Q And the property was turned over to Mrs. Moran?

"A Mrs. Moran and Mrs. Parker.

"Q Now, in that settlement, and among the

indebtedness there, that was assumed, was there a note to the Union bank?

"A There was.

"Q And was there a note to one Sarah Caspar?

"A There was.

"Q And how about executors' fees?

"A They assumed and agreed to pay it in the amount of $2,000.00.

"Q Two thousand dollars, executor's fees that hadn't been paid. Had you at that time received any executor's fees, at all?

"A The only amount received by me up to this time, from '29 to '35, was $300.00."

Concerning the item in Exhibit "A" designated "Agreed Settlement, $2,000" Terrall testified as follows:

"Q Then we find there the statement, 'Agreed Settlement, $2,000.' What is meant by that?

"A That is the amount of money Mrs. Parker and Mrs. Moran agreed to pay for executors' fees on the settlement of the state, and which Mrs. Parker assumed and agreed to pay.

"Q It was following that agreement you turned over the assets of the Pursel estate to them?

"A To them, and settled up the estate.

"Q Later, in May, there, you testified to this division between Mrs. Moran and Mrs. Parker. In that division what are the facts as to whether or not Mrs. Parker then, alone, assumed that obligation of $2,000.00?

"A In that settlement between her and Mrs. Moran, she assumed to pay that amount along with the other.

"Q In the closing of the Pursel estate did you —Was there any allowance of attorney's fees or

claim for attorney's fees made in the account you filed?

"A There was not; because that had. been settled when we made the agreement for residuary legatees to pay that later."

That the agreement was as stated by the defendant is confirmed by reference to the final account of the executors which was filed and of which the plaintiff certainly had notice. We quote:

"That your executors have arranged with the residuary legatees with reference to fees for their services and for attorneys fees and of consequences make no claim herein therefor."

■■ The agreement is also confirmed by the recitals in the contract which was executed in May between the plaintiff and Mrs. Moran which we have already quoted. Thus it appears, not only that the residuary beneficiaries assumed the obligations of the estate, but that after the agreement between them, those obligations were solely assumed by the plaintiff in consideration of her receipt of the larger part of the estate. The plaintiff introduced no evidence to show that the defendant had received any sum as executor's or as attorney's fees in excess of the amount acknowledged by him. The plaintiff testified that she read the agreement between herself and Mrs. Moran, which agreement provided that she should "settle the claim of the executors against said estate; and also all other claims against said estate." Certain memoranda which have an important bearing on this agreement were introduced in evidence but have not been brought to this court, but the verbal evidence indicates that there was an express agreement that the amount of the compensation should be in the sum of $2,000. Counsel for the

plaintiff contends that the defendant should have caused the plaintiff to take independent advice before entering upon the contract with Mrs. Moran in May, 1936, for the reason that the defendant would profit from the performance of the plaintiff's agreement to pay the expenses of the administration. We know of no rule which requires that an attorney should insist upon his client having independent advice prior to the making of a direct contract between attorney and client, for compensation of the former. If attorney and client can make a direct contract for compensation without independent advice rendered to the client, we see no reason why the law should require independent advice when the client makes a contract with a third party which is of indirect benefit to the attorney because it provides for the payment of his compensation.

■ "An attorney is not prohibited from contracting with his client respecting his fees, and a contract thus made after the commencement of the relation of attorney and client is not per se void, but it will, by reason of the confidential nature of the relation, be closely scrutinized by the courts. * * * " 7 C.J.S., Attorney and Client, § 181, p. 1051.

In *Stewart et al., v. Baxter,* 145 Or. 460, 28 P. (2d) 642, the court said:

" * * * While we do not rely upon this wholly, we think that the agreement with the heir, which appears to have been fair and equitable, should be very influential in fixing the amount of compensation of the administrator for extra services. At the time of the administration of the estate, Robert A. Stewart, as stated, was about 28 years of age. The objection to these items at this late date is not well taken.

"The general rule is laid down in 24 C. J. 991, § 2425, thus: 'The compensation of an executor or

administrator may be fixed by an agreement between him and persons beneficially interested in the estate * * *.' ''

The defendant assumed the burden of rendering the accounting and gave testimony in support of every item of receipts and disbursements contained in his Exhibit "A" attached to his answer, and with a few minor exceptions submitted checks in support of his testimony as to all disbursements. His testimony is supported in substantial particulars by that of Mrs. Moran. The brief testimony of Mrs. Parker is so unsatisfactory as to be entitled to little, if any weight. We do not intend to intimate that she was dishonest, but at the time of trial, she was seventy-nine years of age, and her testimony was taken at the hospital owing to her inability to attend at the courthouse. A sample of her testimony is the following:

"Q Did you talk with Mr. Terrall about the will?

"A Never did; never knew anything about the bill [will].

"Q I mean after her death did you discuss with Mr. Terrall the terms of the will after her death?

"A I did not.

"Q It has been shown here by testimony that a Mrs. Moran and Mr. Terrall talked about taking over the hotel property. Do you remember anything of that?

"A Never said much about it.

"Q Didn't ask you that? Did you talk about it at all?

"A Not very much.

"Q What did Mr. Terrall say to you about it, at that time?

"A I can't remember.

"Q Did you talk with him about your affairs and your interest in the estate?

"A I never did.

"Q Was he your attorney at any time?

"A He was, all the time.

"Q During all the time?

"A All the time after Mrs. Pursel died."

The statement by the plaintiff that she never authorized the defendant to make any payments on her behalf is utterly unbelievable. She testified that she left her business entirely in his hands. Her denial of the assumption of the indebtedness of the estate is contradicted by her own written instrument from which her counsel read at the trial, although it is unfortunately not before us. Counsel for the plaintiff conceded that the defendant was entitled to a fee for his services after 1935. The evidence shows that the charges made were reasonable. We may add that the charge made in plaintiff's reply to the effect that the executors wilfully and unlawfully appropriated to their own use $10,000 is false and was unwarranted by any evidence adduced at the trial.

The decree of the circuit court is affirmed.